**In re Ricky McCULLOUGH, Debtor.**

**Andrew S. Richardson,
Trustee, Plaintiff,**

v.

**Ricky W. McCullough and William H. McCullough, Trustee of the Trust of Juliet McCullough, u/d/t March 10, 1998, Defendants.**

**Rhode Island Depositors' Economic Protection Corporation, Plaintiff,**

v.

**Ricky McCullough, Defendant.**

**Bankruptcy No. 98–12466.
Adversary Nos. 98–1172, 99–1020.**

United States Bankruptcy Court,
D. Rhode Island.

Jan. 18, 2001.

Peter Berman, Raskin & Berman, Providence, for Debtor/Defendant.

Thomas P. Quinn, Boyajian, Harrington & Richardson, Providence, for Andrew S. Richardson, Chapter 7 Trustee.

James L. O'Neill, Providence, for William H. McCullough, Trustee.

Peter J. Brockmann, Shechtman & Halperin, Providence, Joseph S.U. Bodoff, Providence, for Rhode Island Depositors' Economic Protection Corporation.

E. Martin Stutchfield, Winograd, Shine & Zacks, P.C., Providence, Guardian Ad Litem.

## OPINION AND ORDER

ARTHUR N. VOTOLATO, Bankruptcy Judge.

Heard on the Chapter 7 Trustee's complaint seeking turnover of the Debtor's interest in the proceeds of the Juliet McCullough Trust (hereinafter "the Trust"). This action has been consolidated with the complaint of Rhode Island Depositors' Economic Protection Corporation (hereinafter "DEPCO"), a judgment creditor of the Debtor, to revoke the Debtor's discharge.

Three main issues were presented at trial: (1) whether the spendthrift clause in the Trust is enforceable under applicable non-bankruptcy law so as to exclude the Debtor's interest in the Trust from the bankruptcy estate; (2) whether the payments received by the Debtor from the Trust within 180 days of the petition date are property of the Debtor's estate under 11 U.S.C. § 541(a)(5)(A); and (3) whether the Debtor's discharge should be revoked pursuant to 11 U.S.C. §§ 727(d)(1) and (d)(2).

After a review of all of the evidence and the post-trial memoranda, this Court will essentially follow and adopt the position of the Chapter 7 Trustee in his Post–Trial Memorandum, Docket # 59, and his Reply Brief, Docket # 64. At the outset, and brushing aside any element of suspense, all issues of credibility and disputed fact are resolved against the Debtor, Ricky McCullough, as are all conclusions of law proposed by him. Specifically, the Court holds: (1) that the spendthrift provision of the Juliet McCullough Trust is not enforceable under applicable non-bankruptcy law, making the Debtor's interest in the Trust property of the estate; (2) alternatively, I find that the Juliet McCullough Trust is testamentary, making the distributions to the Debtor property of his bankruptcy estate under 11 U.S.C. § 541(a)(5)(A); and (3) the Debtor's discharge is revoked.

## TRAVEL AND BACKGROUND

On June 11, 1998, Ricky W. McCullough, an emergency room physician, filed a voluntary petition under Chapter 7 of the U.S. Bankruptcy Code and on July 21, 1998, Andrew S. Richardson, Esq., the Chapter 7 Trustee convened the § 341 first meeting of creditors. On September 24, 1998, the Debtor was granted a discharge pursuant to 11 U.S.C. § 727. On December 30, 1998, based on information obtained at the § 341 hearing, the Chapter 7 Trustee filed an adversary proceeding requesting the turnover of the Debtor's interest in the Trust, and he obtained a preliminary injunction to maintain the status quo. On February 24, 1999, the Trustee amended his Complaint to add William H. McCullough, Trustee of the Juliet McCullough Trust, and the Juliet McCullough Trust as defendants. On February

19, 1999, DEPCO filed an adversary proceeding against the Debtor to revoke discharge under Section 727(d)(1) and (d)(2). Because there exist common issues of fact and law, the DEPCO adversary proceeding was consolidated with the Chapter 7 Trustee's adversary proceeding, and on February 16, 2000, E. Martin Stutchfield, Esq., Guardian Ad Litem for the Debtor's four children, was permitted to intervene as a Defendant in the Trustee's adversary proceeding. At the conclusion of the hearing on these consolidated proceedings, the parties filed proposed findings of fact and conclusions of law.

In his Post–Trial Memorandum the Trustee argues: that a Trust Addendum executed by Juliet McCullough on March 12, 1998, together with the actions of the Debtor and William McCullough, establish clearly that the Debtor alone controlled the disbursement of the proceeds of Juliet McCullough's life insurance policy and that said conduct was consistent with the intent of the late Mrs. McCullough; and that the execution of the Trust Addendum, combined with the Debtor's absolute dominion and control over the Trust funds invalidates the spendthrift provision of the Trust, rendering the Debtor's interest in the Trust property of his bankruptcy estate under 11 U.S.C. § 541(c)(2). Alternatively, the Trustee argues that the Trust is testamentary in nature, and that the payments received by the Debtor from the Trust within 180 days of the petition date are property of the bankruptcy estate, pursuant to 11 U.S.C. § 541(a)(5)(A). Finally, the Trustee argues that the Debtor's discharge should be revoked because the Debtor gave false testimony at his § 341 meeting, and because of his fraudulent failure to report to the Chapter 7 Trustee his acquisition of property of the bankruptcy estate until well after his discharge had entered.

The Defendants do not really address the Trustee's arguments, but rather focus on the manner in which the life insurance proceeds were expended. The Defendants argue, but fail to establish, that no harm means no foul, since the Debtor spent the Trust funds for the general welfare of his family after his wife passed away, in accordance with his late wife's wishes. The Chapter 7 Trustee argues, correctly in my view, that it is the Debtor's control that invalidates the spendthrift provision of the Trust, and that the manner in which the funds were allegedly [1] spent is irrelevant.

### FINDINGS OF FACT

1. In December 1997, The New England issued a term life insurance policy in the amount of $750,000, insuring the life of Juliet Ann McCullough, and Ricky W. McCullough, her husband, was named as beneficiary.

2. In late February, early March 1998, Juliet McCullough became ill, was hospitalized and diagnosed as being terminally ill with cancer, and passed away on April 7, 1998.

3. Upon learning of his daughter-in-law's illness, William McCullough, the Debtor's father, came to Rhode Island in March 1998 and stayed with the family until mid-August when he returned to his home in California. Before Juliet passed away, William McCullough was named as Trustee of her Trust.

4. Prior to this, on September 26, 1997 DEPCO obtained a judgment of $111,375.85, plus interest, against both Ricky and Juliet McCullough. The Debtor testified that one of the purposes of the Trust was to protect the proceeds of the life insurance policy from the DEPCO judgment.

5. On or about March 10, 1998, Juliet McCullough and William McCullough met with Attorney James O'Neill and executed

---

1. As to this red herring, the Debtor has not adequately shown or accounted for the monies allegedly spent for the general welfare of the family, even if they were proper expenditures.

the Juliet McCullough Trust, naming Ricky McCullough as sole beneficiary. Paragraph 5 of the Trust contains a spendthrift provision, which if enforceable, would exempt the Trust assets from bankruptcy.

6. On March 12, 1998, the Debtor and his wife, without the aid of an attorney, drafted the Last Will and Testament of Juliet Ann McCullough, as well as a document entitled "Disbursements of Proceeds From Term Life Insurance." The parties have referred to this document as the "Addendum." On March 17, 1998, Juliet removed her husband as beneficiary of the life insurance policy and substituted the Trust in his place.

7. In its opening paragraph the Addendum states: "In accordance to my desire, the trustee of my Trust (the Juliet McCullough Trust, u/d/t March 10, 1998) shall cause the beneficiary to carry out the following disbursements under the restrictive clauses of the Trust." The Addendum lists the names of persons who were to receive disbursements from the $750,000 life insurance policy in specific amounts, i.e., the Debtor was to receive $400,000; the four minor children's allocations totaled $320,000; Juliet McCullough's mother, father, and three brothers were allocated the remaining $30,000.

8. William McCullough, the trustee of the Trust, testified that he had discussed with Juliet McCullough her concerns for her family after her death, including the welfare and education of her children. He also testified that he had no knowledge of the condition of the family finances, that he was not aware of the DEPCO debt, and had never witnessed any discussions about the Debtor being irresponsible with money. Nor did Juliet McCullough express any concern to Mr. McCullough about his son's (the Debtor's) handling of money. Mr. McCullough testified that he had no reason to distrust his son with the use or control of the Trust money.

9. Mr. McCullough's understanding of both the Trust and his role as Trustee came from conversations with Juliet McCullough, several meetings with Juliet and Attorney O'Neill, and his own review of the Trust document. The purpose and workings of a spendthrift trust were never explained to Mr. McCullough, and he testified that there were no discussions about a spendthrift trust between himself, Juliet, and Attorney O'Neill. Neither was he informed that one of the purposes of a spendthrift trust is to limit the beneficiary's access to the corpus in order to protect the beneficiary from his own shortsightedness.

10. On July 14, 1998, proceeds totaling $768,277.67 from Juliet McCullough's term life insurance policy were deposited into a New England Financial Access Plus account in the name of William McCullough, Trustee of the Juliet McCullough Trust dated 3/10/98, with an address of 249 Hope Street, Providence, RI 02906.

11. According to the Trust account check register maintained by both the Debtor and William McCullough, the following checks were issued: Check No. 101 on July 17, 1998, payable to Ricky McCullough (the Debtor) for $38,277.67; Check No. 102 on July 18, 1998, to James D. Levitt, Esq.-Escrow Account in the amount of $100,000; Check No. 103 on July 21, 1998, to Ricky McCullough for $10,000.

12. Just a few days after these disbursements, on July 21, 1998, at the Debtor's first meeting of creditors pursuant to 11 U.S.C. § 341(a), the Debtor gave the following responses to the Chapter 7 Trustee's questions:

MR. RICHARDSON: Have you received monies from the Trust?

DEBTOR: No.

MR. RICHARDSON: None?

DEBTOR: No.

. . .

MR. RICHARDSON: There was an addendum to the Trust whereby certain

disbursements were directed. Are you aware of this document?

DEBTOR: Yes. Yes.

MR. RICHARDSON: Is that right. Now, have any of these disbursements been made?

DEBTOR: No.

MR. RICHARDSON: No?

DEBTOR: No.

MR. RICHARDSON: Okay. Is all of the money in the Trust today?

DEBTOR: Yes.

MR. RICHARDSON: It is?

DEBTOR: Yes.

13. The Debtor testified that Check No. 101 issued to him in the amount of $38,277.67 was used to pay consumer and medical bills, funeral expenses, and "transition expenses" for his sons, but did not produce, as promised, a list of said bills and expenses.

14. Check No. 102 dated July 18, 1998, payable to James D. Levitt, Esq.-Escrow Account was signed by William McCullough. Check No. 106 was issued payable to the Debtor for $73,000. Checks Nos. 104 through 111 and No. 131, totaling $123,894 were issued between July 27, 1998 and August 3, 1998, and were in the handwriting of William McCullough.

15. In August 1998, when William McCullough returned to California, he left the New England Financial checkbook and account ledger with the Debtor, and before leaving he signed a number of the checks in blank and left them in the Debtor's possession. Starting on August 19, 1998, with Check No. 112, the Debtor's handwriting appears in the check register and on the checks which had been signed in blank by William McCullough. Thereafter, the following checks were made payable to the Debtor: Check No. 112, dated August 19, 1998, in the amount of $60,000; Check No. 114, dated September 4, 1998, in the amount of $55,000; Check No. 115, dated September 25, 1998, in the amount of $45,000; Check No. 133, dated December 4, 1998, in the amount of $30,000; and Check No. 139, dated January 4, 1999, in the amount of $5,100, for a total of $195,100.

16. Sometime during the summer of 1998, William McCullough authorized the Debtor to use his signature stamp as Trustee of the Trust. He also testified that he saw nothing wrong with the Debtor's use of his signature stamp or the signed-in-blank Trust checks, that he trusted his son to make expenditures for the benefit of the family, and that he saw no reason why the Debtor could not be entrusted with complete control of the Trust assets.[2]

17. The Debtor and William McCullough had no specific conversations before the issuance of each Trust check, nor did William McCullough put any cap on expenditures by the Debtor for automobiles and home improvements, nor did he require the Debtor to obtain bids for even substantial home improvements. William McCullough relied solely on the Debtor's judgment regarding expenditures for real estate and stock investments from Trust funds, and he never sought or received independent advice.

18. In May 1998, the Debtor contacted a real estate broker to look for real estate "for the Trust." The Debtor conducted all meetings with the real estate broker and viewed property on Moosup Valley Road in Foster, Rhode Island, which was later purchased by the Trust. William McCullough did not see the Foster property until after a deposit was made, and he was not informed before Ricky hired Attorney James D. Levitt to perform legal work regarding the Trust's purchase of real estate.

19. The Debtor testified that William McCullough, as Trustee, had at times re-

---

**2.** Considering the frequency and amounts of Trust checks being written by Ricky McCullough, one wonders what it would take to give William McCullough concern over his son's judgment in the handling of money.

fused to approve certain expenditures, but he was unable to give any specific examples or occasions as to when that occurred. William McCullough testified that he had voiced disapproval of certain properties that he had looked at with the Debtor, but was equally vague as to details.

20. The Trust bank statements and canceled checks were mailed to the Debtor's residence, 249 Hope Street, Providence, Rhode Island. Trustee William McCullough never asked for or saw these documents until after this litigation began.

21. Funds to the Debtor from the Trust were deposited into his personal Bank Boston checking account, and these funds were co-mingled with his earnings as an emergency room physician. There were no notations on any checks indicating whether expenses were Trust related or personal, and there were also no notations about whether the expenses were allocated to his or his children's share of the Trust. Dr. McCullough did testify "that 100% of the Trust monies spent from his personal account were used for and allocated to the children's share of the Trust funds," but he could not explain why the payment of approximately $30,000 in real estate taxes on his residence, more than $20,000 for his personal automobile, charitable donations to his church, and payments for improvements to the Foster real estate were allocated to the children's share of the Trust.

22. Approximately 309 checks are included in the Debtor's exhibits at trial. One hundred fifty-one of these checks are dated *prior* to July 17, 1998, the day the Debtor first received any Trust funds. The Debtor testified that the money that he received from the Trust was not reimbursements for these expenses, and, we conclude that these 151 checks are not relevant to an analysis of the use of Trust funds. Other than to clutter the record, we wonder why they were included. The remaining 158 checks were purportedly for trust expenses. Approximately 450 checks should have been written from the Debtor's personal checking account from July 1, 1998 through January 4, 1999, i.e., the check numbers for that period begin at Check No. 1116 and end at Check No. 1566. The Debtor failed to produce *any* of the 292 missing checks written during this period, nor has he explained their absence.

23. On January 4, 1999, the Debtor applied for an E*Trade stock trading account in the name of the Trust. This account was set up by the Debtor, who listed himself as co-trustee of the Trust with William McCullough. William McCullough had no knowledge of the E*Trade account until several months after it was opened. The Debtor traded stocks through the account without consulting William McCullough, the Trustee.

24. From July 17, 1998 to January 4, 1999, the Debtor received funds from the Trust totaling $326,377.67, and testified that the way the Trust was handled and the expenditures made were for the general welfare of the family and were consistent with both his wife's intent and with his understanding with William McCullough, as Trustee of the Trust. It was also the Debtor's understanding that he was supposed to receive $400,000 outright from the Trust.

25. It is stipulated that the Chapter 7 Trustee first learned of the distributions from the Trust by a December 17, 1998 letter to the Chapter 7 Trustee from the Debtor's counsel. This letter was in belated response to two requests by the Chapter 7 Trustee, one on November 11, 1998 and the other on December 2, 1998, seeking information about Trust disbursements.

### *CONCLUSIONS OF LAW* [3]

▮ First for consideration is whether the Juliet McCullough Trust is a valid spendthrift trust. The Defendants argue

---

**3.** In reaching our conclusions of law, I generally agree with and adopt the analysis of the Chapter 7 Trustee as stated in his Post Trial Memorandum, Docket # 59, and his Reply Brief, Docket # 64.

this issue in the affirmative on the ground that such trusts are excluded from a bankruptcy estate under Section 541(c)(2) which states: "A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title." 11 U.S.C. § 541(c)(2); *see also In re Goldberg,* 98 B.R. 353, 356 (Bankr.N.D.Ill.1989). Trusts containing spendthrift provisions are valid under Rhode Island law.

> "Any person creating an express trust for the benefit of any other person or persons may by the terms thereof establish valid restraints on the voluntary and/or involuntary transfer of interests therein by the beneficiaries thereof, whether by way of anticipation or acceleration, assignment, hypothecation, or by virtue of legal process in judgment, execution, attachment, garnishment, bankruptcy, or otherwise."

R.I. Gen. Laws § 18–9.1–1.

■ "A spendthrift trust is one in which, by direction of the settlor, the right of the beneficiary to payments from the trust fund or the income thereof is not transferable by him nor liable to be taken from him for satisfaction of his debts." *Industrial Nat. Bank v. Budlong,,* 106 R.I. 780, 786, 264 A.2d 18 (1970), *citing Bogert, Trusts and Trustees* (2d Ed.), § 221, at 623. "The purpose of a spendthrift trust is to protect the beneficiary from himself and his creditors." *In re Cattafi,* 237 B.R. 853, 856 (Bankr.M.D.Fla.1999), *citing Croom v. Ocala Plumbing & Elec. Co.,* 62 Fla. 460, 466, 57 So. 243, 244–45 (1911). "[N]o particular form of language is necessary to create a spendthrift trust, but the settlor must manifest her intention in language which is clear and unequivocal." *In*

*re Baldwin,* 142 B.R. 210, 213 (Bankr. S.D.Ohio 1992).

■ In bankruptcy, the degree of control exercised by the debtor over the spendthrift trust is often the primary consideration in determining whether the trust is valid. *See In re Schwen,* 240 B.R. 754, 757 (Bankr.D.Minn.1999). There appear to be no Rhode Island cases which address whether the Debtor's exercise of dominion and control over the Trust invalidates the spendthrift provisions, so we will look to the case law of other jurisdictions. [A] trust that contains spendthrift provisions cannot be a spendthrift trust if: (1) the settlor of the trust is also the beneficiary of the trust; (2) the beneficiary has dominion and control over the trust; (3) the beneficiary may revoke the trust; or (4) the beneficiary has powers in the trust.[4]

*In re Gallagher,* 101 B.R. 594, 600 (Bankr. W.D.Mo.1989), *citing, In re Swanson,* 873 F.2d 1121, 1124 (8th Cir.1989); *see also In re O'Brien,* 94 B.R. 583, 587 (W.D.Mo. 1988).

■ The Chapter 7 Trustee focuses his argument on the issue of dominion and control by the Debtor, while the Defendants argue that the Court should end its inquiry with the spendthrift provision in the original trust and find that the Juliet McCullough Trust is a valid inter vivos spendthrift trust. The Defendants point simply to Article 5 of the Juliet McCullough Trust which contains boilerplate spendthrift language.[5] However, "[t]he existence of an anti-alienation provision does not in and of itself qualify the trust as a spendthrift trust. The trust must still meet certain standards to be excluded from the bankruptcy estate pursuant to § 541(c)(2)." *In re Baldwin,* 142 B.R. at

---

4. Provisions (2) and (4) of the *Gallagher* definition are clearly met in this case.

5. Article 5 of the Juliet McCullough Trust states, "No money or property payable or distributable under this trust shall be pledged, assigned, transferred, sold or in any matter whatsoever anticipated, charged, or encumbered by the beneficiary hereunder or in any matter liable in the possession of the Trustee for the debts, contracts, obligations, or engagements of such claims, legal or equitable against any such beneficiary. The Trust property shall not be subject to attachment."

214, citing, *In re Swanson*, 873 F.2d at 1121.

■ In determining whether the spendthrift provision of the trust is valid, we must also keep in mind an important policy of the Bankruptcy Code. "It is the policy of the Code to enlarge the bankruptcy estate to the extent possible under the Code in an effort to provide creditors with the distribution to which they are entitled. Accordingly, § 541(c)(2) must be narrowly construed to avoid impinging upon the policies sought to be furthered by the Code." *Baldwin*, 142 B.R. at 214.

■ I agree with the Chapter 7 Trustee that the original trust should not be examined in a vacuum, but must be looked at together with the Addendum *and the conduct of the Debtor*, which discloses blatant and unfettered dominion and control over the Trust assets. "[T]he Court must analyze the terms of the Trust not only for the actual exercise of dominion and control by the debtor but also for the ability of the debtor to exercise dominion and control." *Id.* at 215, citing, *In re Swanson*, 873 F.2d at 1124. "It is clear that if the beneficiary has absolute and sole discretion to compel distribution of the trust assets, the spendthrift provision must fail." *In re Schwen*, 240 B.R. at 757. "However, something less than absolute control may also destroy the spendthrift character of a trust." *Id.*, citing, *McCauley v. Hersloff (In re Hersloff)*, 147 B.R. 262, 266 (Bankr.M.D.Fla.1992).

The Trust Addendum states:
"In accordance to my desire, the trustee of my trust (the Juliet McCULLOUGH Trust, u/d/t March 10, 1998), *shall cause the beneficiary to carry out the following disbursements* under the restrictive clauses of the Trust . . .". (emphasis added).

Under the Addendum, the Debtor clearly was given the power to control the disbursement of the proceeds of the life insurance policy, and that the settlor, Juliet McCullough, intended for the Debtor to exercise such control, i.e., the Addendum gives the Debtor, who is the sole beneficiary of the Trust, unrestricted power to make disbursements in his sole discretion.

■ However, this is not the end of the Court's inquiry, and the analysis continues by examining the actions of the debtor/beneficiary, because "[i]f the beneficiary exerts sufficient dominion and control over the trust property, the trust can no longer be considered spendthrift." *In re Bottom*, 176 B.R. 950, 953 (Bankr.N.D.Fla.1994). The evidence establishes conclusively that other than William McCullough merely signing some of the Trust checks, many in blank, virtually all disbursements of Trust funds were made by the Debtor, under his direct, unsupervised control. Counsel for both the Trustee of the Trust and the Guardian Ad Litem propose, without factual or legal support, that because there was a Trustee of the Trust (William McCullough), the Debtor did not possess sufficient control to justify invalidation of the spendthrift provision. *See Schwen*, 240 B.R. at 757. In *Schwen*, the Bankruptcy Court held that because the debtor's control over the trust was limited by a co-trustee and her fiduciary duties to the other beneficiaries, she did not exercise sufficient dominion and control over the trust property to invalidate the spendthrift provision. *Id.* at 757–58. The debtor in *Schwen* could not act with respect to trust assets without her brother's (the co-trustee's) consent. *See id.* at 757. Here, the Debtor's control over the Trust property was not limited or inhibited in any way by the fact that his father was the actual, sole Trustee. The evidence is that even when William McCullough was in Rhode Island, his limited role was to sign the checks that the Debtor placed in front of him, without any inquiry, and there is no evidence that William McCullough ever refused to sign a check for the Debtor. After William McCullough left Rhode Island, the Debtor had and exercised total control of the Trust checkbook by virtue of the fact that his father left signed, blank checks for the

Debtor's cart blanche use. The Chapter 7 Trustee points out that about $325,000 of the Trust money went directly into the Debtor's personal checking account, over which the Debtor had sole control.

The Debtor's actions with respect to the E*Trade stock trading account is also demonstrative of his dominion and control over Trust assets. The Debtor opened this account without the knowledge of William McCullough, by using his father's signature stamp. The Debtor then, without his father's knowledge or permission, named himself as Co–Trustee on the account and traded stock in the account. Additionally, unlike the debtor in *Schwen,* Ricky McCullough was not limited by any fiduciary duty to other beneficiaries, because he was the sole beneficiary of the Trust.

I find not only that the Debtor had unlimited access to the Trust assets, but that this degree of control was in fact directed and intended by the settlor, Juliet McCullough, rendering the Trust void ab initio. The settlor never advised Trustee William McCullough that she intended the Debtor's access to be limited, and if Juliet truly intended this to be a spendthrift trust, there should have been some contact between her, Attorney O'Neill, and William McCullough as Trustee of the Trust, and the Trust Addendum would not have authorized or directed the sole beneficiary to make the disbursements. Because of the language of the Addendum, the actions of the Debtor, the passive role played by William McCullough, and the obvious intentions of the parties, it is clear that the Debtor exercised sufficient control and dominion over the Trust funds to invalidate the spendthrift trust provision.

■ Alternatively, should the rulings above not survive an appeal, I find that the Juliet McCullough Trust is testamentary in nature and therefore the distributions to the Debtor are "bequests" under Rhode Island law. This conclusion is in accordance with *Knowles v. Metropolitan Life Ins. Co.,* 60 R.I. 197, 197 A. 459 (1938),

which held that an attempt by an individual to make a disposition of her property after her death without passing a present interest to a trustee is testamentary in nature. *Id.* In *Knowles,* the insured changed the beneficiary of her insurance policy to "James H. Barney, Jr., Trustee." *Id.* at 460. Thereafter, the insured executed an instrument purporting to be an indenture of trust, which appointed James H. Barney, Jr., Trustee to receive and hold title to all her personal property, on certain conditions. Additionally, James J. Barney, Jr. was named beneficiary of the insurance policy in his capacity as Trustee for "the uses, purposes, and trusts set forth in the aforesaid trust instrument." *Id.* The Court stated that:

> There can be no question that the indenture of October 14, 1935 was an attempt by the owner to make a disposition of her property after her death without passing a present interest to the trustee. Being testamentary, it was necessary that it be executed in accordance with the requirements of the statute of wills.

*Id.* at 461. Because there was only one witness to the trust instrument, it was invalid.

Unlike the trust in *Knowles,* the Juliet McCullough Trust was validly executed. However, no present interest in property passed to William McCullough, the trustee of the Trust at its inception. The Trust, which was to be funded solely by the proceeds of Juliet McCullough's life insurance policy, was established one month before her death in order to distribute the proceeds of the policy after her death. This fact, plus the clear language of the Addendum which states that the Addendum is included as an "insert to my Will and Trust" forecloses any notion that the Trust was not intended to be testamentary.

This testamentary intent is further illustrated by the actions of the Debtor and William McCullough. The Trust documents do not provide for the payment of Juliet McCullough's debts, taxes, or funer-

al expenses. The provision for these items is found in the second paragraph of Juliet's Will. However, the Debtor testified that he used the first $38,277.67 that he received from the Trust to pay these debts as directed by Juliet's Will. There can hardly be a clearer expression of testamentary intent than a direction by the testator to pay funeral and burial expenses from her life insurance proceeds. For all these reasons, I find that the Juliet McCullough Trust is testamentary in nature and was established as a "will substitute."

This requires us to consider Bankruptcy Code § 541(a)(5), which includes as property of the estate:

> Any interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the petition, and that the debtor acquires or becomes entitled to acquire within 180 days after such date (A) by bequest, devise, or inheritance.

11 U.S.C. § 541(a)(5)(A).

> [N]either cases nor legislative history have addressed the treatment of will substitutes from the standpoint of creditors' claims against the debtor. If will substitutes are deemed testamentary for purposes of creditors' claims in bankruptcy, they will be deemed to be transferred when the benefactor dies and will be subject to the six-month window of § 541(a)(5)(A). If they are held to constitute gifts, on the other hand, they will be deemed to be transferred when the initial instrument of gift is executed and will fall into the bankruptcy estate if that event occurred before (but not after) the petition.

*In re Crandall,* 173 B.R. 836 (Bankr. D.Conn.1994), *quoting, Adam J. Hirsh, Inheritance and Bankruptcy: The Meaning of the Fresh Start,* 45 Hastings L.J. 175, 182 n. 24 (1994). Since the Debtor acquired $321,377.67 from the Will and Trust of Juliet McCullough within 180 days of the petition date, it follows that said acquisition constitutes a bequest, devise or inheritance, which is property of the bankruptcy estate.

The Chapter 7 Trustee references the case of *Togut v. Hecht,* 69 B.R. 290 (S.D.N.Y.1987), where the District Court affirmed a ruling that the bankruptcy trustee was entitled to any payments from a testamentary spendthrift trust actually received by the beneficiary/debtor within 180 days of the filing of the bankruptcy petition under § 541(a)(5)(A). *Id.* In *Hecht,* the debtor was one of four beneficiaries of two spendthrift trusts created in separate wills by his grandparents. *See In re Hecht,* 54 B.R. 379, 381 (Bankr. D.N.Y.1985), *aff'd,* 69 B.R. 290 (S.D.N.Y. 1987). The Bankruptcy Court held that the Trusts were spendthrift trusts and thus *Hechts'* creditors and the bankruptcy trustee could not touch the trust corpus. *Id.* at 383. However, the court found that the income received by the debtor, and the income to which the debtor was entitled by the terms of the trust during the 180 day period after the filing of the petition was not shielded from the bankruptcy trustee's avoiding powers. *Id.* at 384. The Court concluded that: "[o]nce income is received by the beneficiary or the beneficiary is entitled to receive it under the terms of the trust, the income is no longer entitled to spendthrift protection." *Id.* at 383. Applying this reasoning, I find that the $325,000 received by the Debtor within the 180 days of the filing of his petition is not subject to the Trust's spendthrift provisions and constitutes property of the estate.

Additionally, as the bankruptcy Trustee notes, the Rhode Island Supreme Court has held that: "[c]ourts refer to testamentary gifts of trust income as 'bequests.'" *Smith v. City of Providence,* 63 R.I. 333, 341, 9 A.2d 10 (1939). Because we have found the Trust and Addendum to be testamentary, the funds received by the Debtor within the 180 days of the petition are bequests and are property of the bankruptcy estate. *Accord, In re Gower,* 184 B.R. 163 (Bankr.M.D.Fla.1995); *Smith v.*

*Moody (In re Moody),* 837 F.2d 719 (5th Cir.1988) (under § 541(a)(5)(A), payments which are bequests from a spendthrift trust to which the beneficiary is entitled or received within the 180 day period after the filing of the bankruptcy petition are property of the bankruptcy estate.)

This Court rejects the position of the Debtor, the Trust, and the Guardian Ad Litem that the Juliet McCullough Trust is an inter vivos spendthrift trust. The Defendants rely on the case of *Magill v. Newman (In re Newman),* 903 F.2d 1150 (7th Cir.1990), where the 7th Circuit Court of Appeals sustained the district court's reversal of the bankruptcy court and found a debtor's interest in the distribution of the corpus of a spendthrift trust and distributions of income from the Trust made to the debtor within 180 days following the filing of the bankruptcy petition were not property of the bankruptcy estate. Unlike the Juliet McCullough Trust which we have found is a testamentary trust, the trust in *Newman* was an inter vivos trust of which the debtor was the beneficiary. Therefore, *Newman* is distinguishable and does not alter our holding that the distributions received by the Debtor in the 180 days after the bankruptcy petition are property of the bankruptcy estate under Section 541(a)(5)(A).

The last issue to be addressed is the revocation of the Debtor's discharge, and here I adopt the Chapter 7 Trustee's position that the discharge should be revoked pursuant to 11 U.S.C. § 727(d)(1) and § 727(d)(2).

■■■ Section 727(d) states,

On request of the trustee, a creditor or the United States Trustee, and after notice and a hearing, the Court shall revoke a discharge granted under subsection (a) of this section if—

(1) such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge;

(2) the debtor acquired property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee; ...

11 U.S.C. § 727(d)(1) & (2). "As a general rule, to obtain relief under § 727(d)(1), the plaintiff must prove that the debtor committed fraud in fact." *In re Bowman,* 173 B.R. 922, 925 (9th Cir. BAP 1994), *(citing, In re Edmonds,* 924 F.2d 176, 180 (10th Cir.1991)). "The fraud must be proven in the procurement of the discharge and sufficient grounds must have existed which would have prevented the discharge." *Id.* (*citing, In re Topper,* 85 B.R. 167, 169 (Bankr.S.D.Fla.1988)). "The plaintiff must also prove that it was unaware of the fraud at the time the discharge was granted." *Id.*

■■■ To revoke a discharge under Section 727(d)(1), "we must find that fraud was committed prior to the discharge bar date and that the debtor/defendant's discharge would have been denied under 11 U.S.C. § 727(a) if this Court had been made aware of the fraud prior to granting the discharge." *In re Emery,* 170 B.R. 777, 783 (Bankr.E.D.N.Y.1994), *rev'd on other grounds,* 201 B.R. 37 (E.D.N.Y.1996).

Pursuant to 11 U.S.C. § 727(a)(4), a discharge will be denied if an objecting party can prove that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.

*Emery,* 170 B.R. at 783 (footnote and citations omitted); *see also In re Sears,* 225 B.R. 270, 273–74 (Bankr.D.R.I.1998).

■■■ The Chapter 7 Trustee has established all five elements of the *Emery* case. The Debtor's testimony at the § 341 meeting, that he had not received any monies

from the Trust, when he had actually received $38,277.67 from the Trust four days prior to the meeting was nothing less than an intentional falsehood. To add further insult to what had already transpired, the Debtor received $10,000 on the same day as the § 341 meeting! The Debtor also testified that no disbursements had been made per the Trust Addendum, even though he had issued a check for $100,000 to the James D. Levitt, Esq.,-Escrow Account on July 18, 1998. The Debtor also testified that all of the insurance money was still in the Trust account, when he well knew that three checks totaling $148,278 had been written from that account.

The Debtor argues that he understood the term "disbursements" to mean distributions made to the beneficiaries of the Trust, and explains this interpretation as the result of "conversations with his counsel after the DEPCO deposition," but this lame explanation does not address the rest of his false testimony. At bottom, as stated previously, all credibility issues are resolved against the Debtor.

Examples (but not all) of the Debtor's lack of credibility are too numerous: (1) the Debtor testified that Check No. 101 was drawn in the amount of $38,277.67 to pay bills and expenses which equaled that exact amount, and that the funds were used for consumer goods, medical bills, funeral expenses and "transition expenses for the boys." However, the Debtor did not produce any of said bills or receipts. Also of concern is the unexplained coincidence of the initial deposit into the Trust Account of $768,277.67 and the fact that Check No. 101 was in the amount of $38,277.67, leaving an exact balance of $730,000 in the account; (2) although the Debtor did admit that certain expenses allocated to the children's share of the Trust were a "stretch," he could not explain why the payment of $30,000 in real estate taxes on his residence, $20,000 for his personal automobile, charitable donations to his church, and payments for the improvement to the Foster real estate were also allocated to the children's share of the Trust.

Without further belaboring the point, it is also clear that the Debtor testified knowingly and untruthfully at the § 341 meeting. "Allegations of lying in the filed Schedules and Statement of Affairs, and lying at both the 341 Meeting and the Rule 2004 Examination, satisfy the requirement of alleging a post-petition fraud." *Emery*, 170 B.R. at 782; *see also, In re Kingsley*, 162 B.R. 249 (Bankr.W.D.Mo.1994) (intentional misrepresentation of assets and liabilities on bankruptcy schedules and at meeting of creditors constituted fraud under 727(a)(4)(A)). The Chapter 7 Trustee did not learn of the falsity of the Debtor's testimony until December 1998, *after* entry of discharge, and if he had known of the Debtor's false testimony prior to entry of discharge, based upon these facts, the Trustee could have, should have, and would have successfully objected to the entry of the Debtor's discharge.

I also find that the Chapter 7 Trustee has established overwhelmingly that: (1) the Debtor's statements under oath were false; (2) the Debtor knew those statements were false; (3) the Debtor intended to mislead the Chapter 7 Trustee regarding the money in the Trust; and (4) the Debtor's false statements were material to the bankruptcy case. Accordingly, the Debtor's discharge is revoked under 11 U.S.C. § 727(d)(1).

The Debtor's discharge also should be and is revoked under 11 U.S.C. § 727(d)(2). "As a general rule, a plaintiff must prove that the debtor acquired or became entitled to acquire property of the estate and knowingly and fraudulently failed to report or deliver the property to the trustee, in order to obtain relief under 727(d)(2). Both elements must be met and the plaintiff must prove that the debtor acted with the knowing intent to defraud." *Bowman*, 173 B.R. at 925 (*citing In re Yonikus*, 974 F.2d 901, 905 (7th Cir.1992)). "The trustee has the burden of establishing both the acquisition of property which

becomes property of the estate and the knowing and fraudulent failure to either report the acquisition or deliver the property to the trustee." *In re Couch*, 54 B.R. 682, 684 (Bankr.E.D.Ark.1985) *(citing, In re Black,* 19 B.R. 468 (Bankr.M.D.Tenn. 1982)); *In re Guerrero,* 30 B.R. 463 (N.D.Ind.1983).

Dr. McCullough acquired $38,277.67 from the Trust within five days of his § 341 meeting, and an additional $10,000 on the day of the meeting. I have previously ruled that these distributions and subsequent distributions to the Debtor were property of the estate pursuant to § 541(a)(5)(A), and that the Juliet McCullough Trust was not a valid spendthrift trust. Thus, the first prong of Section 727(d)(2) is satisfied—i.e., that the Debtor acquired property of the estate. It is also clear that the second element—that the Debtor fraudulently did not report the property to the Chapter 7 Trustee—is also satisfied. The Debtor knowingly and fraudulently denied receiving *any* monies from the Trust. He also testified falsely at the § 341 meeting that all the money was still within the Trust as of the date of the § 341 meeting. Furthermore, the Debtor failed to report subsequent monies received, approximately $280,000, and it was not until December 1998 that the Chapter 7 Trustee received financial information from Debtor's counsel that he first learned that the Debtor had received checks from the Trust totaling $321,377.67.

The Debtor's false testimony at his § 341 meeting was intended to mislead and hinder the Chapter 7 Trustee from investigating the Debtor's receipt and use of Trust funds. Under the circumstances, the discharge is also revoked under 11 U.S.C. § 727(d)(2), because the Debtor acquired property of the estate both before and after the § 341 meeting and knowingly and fraudulently failed to inform the Chapter 7 Trustee of the receipt of said property.

## CONCLUSION

For the reasons stated above, I hold that the spendthrift provision of the Juliet McCullough Trust is not enforceable under non-bankruptcy law, and that the Debtor's interest in the Trust is property of this bankruptcy estate. I also rule that the Juliet McCullough Trust is testamentary in nature and that the distributions therefrom to the Debtor in the 180 days after the bankruptcy filing are property of the bankruptcy estate, pursuant to 11 U.S.C. § 541(a)(5)(A). Additionally, the Debtor's discharge is revoked under both 11 U.S.C. § 727(d)(1) and (d)(2).

Enter Judgment consistent with this opinion.